For both sides would approach that podium and tell us who you are and who you represent. Please call the first case The epilogue Good morning My name is Andy Schwartz I'm from the firm of Schwartz & Kanyon. Accompanying me is my associate Karen Jeffries. We are here on behalf of the Appellant Ronald Chez. Are you going to do the argument Mr. Schwartz? I'm going to do the argument. Very good. Welcome. Thank you. Good morning, Justices Jeffrey Heftman, Gazdeki, Del Giudice, Americus, and Farkas on behalf of Evette Pelley, Catherine Malkin, formerly known as Catherine Chez, who is the President of the Court, and my colleague Rick Del Giudice. Each side is 15 minutes. You'll save some time, Mr. Schwartz, for a reply. We've read the briefs. We've seen the portions of the record. I'm sorry if that's on titus. We're ready anytime you are, Mr. Schwartz. Thank you very much. May it please the Court, we're asking you to correct a terribly unfair result in the lower case where Catherine Chez, or now Catherine Malkin, received a huge windfall at my client's expense. The divorce property statute in this case does not control because the parties as the agreed opted out of the divorce statute. An affair on a proper resolution in this case depends really on contract law and common law contribution. Just briefly, we've argued that the de novo standard of review applies. Both parties stipulated to the PMA at trial. Both parties say the PMA is not ambiguous. There's no factual dispute as to what it says. Therefore, we believe that both sides should really agree that the de novo standard applies because the interpretation of the PMA presents a pure legal question. The main issue in this case is whether a PMA, a primarily agreement, that does not say anything about common law contribution eliminates the right of common law contribution. And the real basis that it contains the entire understanding of the parties. Correct. Contract laws to apply. Correct. So if the PMA contains the entire understanding of the parties and is silent as to any so-called contribution claim, how can we force them to adhere to a contribution remedy? Because under the Illinois Banker's Life case that we've got cited, the common law is a material part of any contract. It is included within a contract unless it is specifically excluded from the contract. I mean, parties can vary their rights, their default rights, under the common law. But if they do not do so explicitly, Justice Harris, then the common law portion, which is an implicit portion of the contract, resides and remains within the contract. In addition, the PMA says, and I think this is an important highlight, in the event of a dissolution of the party's marriage, all joint property shall be divided equally between the parties. Contribution silent. That is entirely consistent with joint tenancy. Essentially what we have here is we have the parties taking title to these two properties, the Aster and Carmel properties, in joint tenancy. And if you take a look at the language of the PMA, it essentially contracts to take title in joint tenancy. Because if you take a look at Article 7c, it's talking about dividing proceeds, or dividing the properties equally. And if you take a look at 8a, the parties contract it for a right of survivorship. These are things that are perfectly consistent with joint tenancy. And the idea here is that joint tenancy at property, actually in the PMA, any type of concurrently owned property becomes joint tenancy property. And any separate property remains separate property. That's the PMA in a nutshell. The PMA was written by Ronald's lawyers, right? The PMA was written by lawyers for both sides. There were, if you take a look at the PMA, it shows that Catherine had an attorney representing her, and Ronald had an attorney representing him. There was testimony at trial that we couldn't rebut because Ronald's attorney had, who drafted the PMA, had died by the time the trial came along. But there was nothing ambiguous about it, right? We don't believe the PMA is ambiguous. Well, if it's not ambiguous, then we're not allowed to go to extrinsic evidence to interpret an unambiguous document. We're not asking to admit extrinsic evidence such as parole evidence. What we're asking you to do is to apply the ordinary rules of contract interpretation. And there are rules of contract interpretation, the completeness rule, the expressio unius rule, the don't look at parole evidence rule. These are all rules that... And don't add matters that aren't included in the document. Correct. And the matter that was added in this case was the extinguishment of a common law right of contribution. One of the rules of contract law, as I pointed out in that Illinois Banker's Life case, is that the law in existence at the time the contract is entered into is a material term of the contract. In this case, there is a common law right of contribution that is a material term. So you have two very sophisticated, successful, entrepreneurial-type parties execute a premarital agreement and are sophisticated in the ways of real estate and investment. And neither one of them saw fit to say, for example, that in the event either one of us contributes to the property, our basis will be affected by their contribution. They didn't do that. That explicit language is not in the contract. Or anything to that effect. And it doesn't need to be, because it's already there, because the law of contribution is a material term in the contract. It's a material term of the PMA, though, right? Your argument is that the PMA specifically includes the IMDMA, the divorce statute, but it doesn't specifically exclude contract, the idea of contract, the common law, rather. And therefore, common law applies, right? Okay. How much money were you talking about here? On page 14 of your white brief, you say that Mrs. Chez should have gotten $994,000 and Mr. Chez $2.945. So I take it she got $1 million more under your theory than she should have, right? I believe that Mr. Chez contributed roughly, and it's rough numbers, because there were some discrepancies in the lower court evidence, but I believe that Mr. Chez contributed roughly $3 million more in terms of carrying costs and things of that nature. I think you may be looking at just one of the properties. I am. I'm sorry, Carmel. Okay. You're absolutely correct. All right. So as to Carmel, the difference is $1 million, right? I believe that's in the rough neighborhood. And how much difference in Esther? I believe it was closer to two in Esther. Esther was a more valuable property. It had a larger mortgage, and I believe there were significantly higher carrying costs. Was that sold, though, for a profit, Esther? Esther was never sold. All right. Esther was divided at the trial, and it was assigned to Ron, and there was an adjustment made for Catherine. Okay. The point that I think is an important one is that the PMA has a very different treatment for separate property than it does for joint property. To your point earlier, the parties did not specifically include language saying, we are going to eliminate the right of common law contribution, and they didn't explicitly include any language talking about contribution or reimbursement for contributions. But what they did in the separate property is they made sure to eliminate the right of one spouse to make a claim against the separate property of the other. So what we see is we see the parties electing to treat two different types of property very differently. They said, we're eliminating the right of a claim as to separate property. We're not going to do anything with respect to joint property. That has some import, and the import is it shows that they elected to treat the two types of property differently. And one of the problems that we have is that the lower court said, well, that's okay, because joint property is really separate property. Now, that is erroneous, and it's erroneous because this PMA took great care to define joint property in Article 7C, and it took great care to define separate property in Article 4 and Article 7A, and it capitalizes the terms. Now, when you draft a contract, why do you capitalize a term? Because it's important, and because you want to assign a particular meaning to a term in a contract. And if you do that, you're essentially saying, we don't want it to mean something else, and yet that's exactly the error that the lower court made, and that's what we're asking you to find was wrong. The vast majority of the realty purchased by Mr. Chess, with or without the assistance of Catherine, was purchased under his name only and, therefore, was designated as separate property, right? And you're not fighting over that at all, are you? There were some properties that were purchased in Mr. Chess's name alone. There were some properties that the parties did deals with that were purchased in both of their names, and I believe there was one property that was in tenancy by the entirety, even though neither party ever lived there. There were some that were – there was at least one that was purchased in joint property. What we are fighting over is the two pieces of the aster in the Carmel property. Correct. Which were purchased in both of their names. They were purchased in joint tenancy. And so, therefore, you would consider normal people who read English would normally then think that would be joint property. Is that correct? You're not arguing they're not joint property. They were joint property because that's how they were titled. And so – and then the PMA has a paragraph about how joint property is to be divided at the time of a divorce, because that's the purpose of the PMA, is that we know we're going to get divorced, and here's how we're going to divvy it up. All the separate properties are to stay in the person's name, whoever took it in, and the joint property is supposed to be split up equally. It just says divided equally, to be divided equally. And the problem with just taking a snapshot of saying, well, we're going to only take a snapshot in time at the moment of the divorce, is that's horribly unfair to the person who put all the money into the property. Isn't that when you evaluate property, especially for Mr. Chez and Mrs. Chez, who, as Justice Persons pointed out, this is what they do, they pay property. That's what these people do. They go out and buy lots of property, and they sell it. Clean it up, do whatever they want to do with it, and they sell it. So this is not a surprise. It should not have been a surprise to Mr. Chez when his lawyers wrote this up, and he signed off on the idea. He liked the idea at the time, the PMA. There's no hint that he was forced to sign it. Is there any coercion involved? Is this after the fact of the divorce? He thought he'd get more money. He wanted more money, and he thinks the PMA would provide for it. Well, clearly it does not. He wanted to get the money back that he contributed, as is his right, with respect to a joint tenancy. And this is a contract to create a joint tenancy. And equally should mean that the parties are treated the same. They have the same status. They should be treated one and the same. Divided equally means that it should also then be the profits divided equally? It should be the net that's left after everybody gets back what they put into it should be divided equally. That's what it means. And the PMA did not say that, did it? The contract is not entirely clear on that unless you adopt the rule of construction that says you incorporate the law at the time the contract was entered into. That's the importance of the Illinois Banker's Life case. That's been the law in Illinois since at least 1930. There is no case that has come before the courts on this contribution addition to a PMA which is silent. We could not find one. Opposing counsel, I believe, could not find one, which is why we're dealing with largely non-PMA-related case law.  Not under these exact facts, but a PMA is a species of contract, and the general law of contract and the general law of contribution applies here. The other point that I wanted to make is that there's a – If we were to agree with you on that, then we're adding terms and conditions to a PMA that is absolutely silent on the matter. You are not adding terms and conditions. You are applying the law that provides – the law of contracts that provides that the law in existence at the time is incorporated as a material term of the contract, and that's exactly what the Illinois Banker's Life case says. From 1930, which was whatever that was. Correct. 40 years before the IMDMA, whatever the initials are for the – Correct. And as to their comment that the IMDMA displaced that law, it would have displaced it had the parties elected to follow the IMDMA. The fact is we opted out – the parties opted out by signing the premarital agreement, which leaves the common law. I'd suggest it leaves the PMA, which says – And the PMA. Correct. Since it doesn't mention it, and we're going to keep open the common law. What's your next point? The next point – Two minutes before you – Okay. Thank you. The next point is that there is a separate but related type of contribution, which is a contribution claim among joint debtors. This is under the UCC, which we've cited, and it's also under the common law, that if you've got multiple parties co-signing for the same debt, then if one overpays, the overpaying co-debtor is entitled to reimbursement from the nonpaying or underpaying co-debtor. And on this point, the PMA is silent as to the sharing of debts. The IMDMA does not apply. The IMDMA does not have a separate section that deals with the payment of debts. Debts are treated as a function of property, which is Section 503 of the divorce statute. The problem is the parties opted out of Section 503, which leaves us back with the common law and the UCC law, which is a statutory law. Catherine's argument that these were all a series of gifts does not fly. She admitted in the 216 responses that Ron had advanced payments, that she had an agreement to repay Ron. She actually did repay Ron. There was some evidence of that in the case below. And quite simply, you do not repay a gift. A gift is something you get, and it's yours. Take a look at what was Ron's trial Exhibit 5, which you'll find in the record at R2608 through 2609. And if you look at page R2608, you will see that Catherine reported, this is her self-reporting, a $9 million debt to Ron regarding Aster and a $5 million debt to Ron regarding Carmel. So this is what she is self-reporting to a bank in order to get money under penalty of perjury, and that further proves this is not a gift. She also co-signed for the debts, showing that she was obligated to make repayments to the lenders. One minute. What's that? You have one minute. Okay. Thank you. The scope of the PMA, it's limited. It only extinguishes rights that are created because of the marriage. It does not eliminate rights that exist independently of the marriage, such as common law contribution rights. Because common law contribution rights can apply to people who are not married or to people who are married. A couple other stray points. There was no evidence to support the lower court's comment about the value of Ron's use of these properties. There was just no evidence in the record at all. In conclusion, lower court erred here when it denied the contribution claim. It unfairly gave Catherine a free ride at Ron's expense. In doing so, it divided Carmel and Astor unequally, and we ask you to reverse that decision. Thank you. Thank you very much. Thank you. Mr. Heffman. May it please the Court. The appellant's plea is one for equity when a PMA unambiguously calls for that of equal distribution. Framed in an argument of accusations of unfair results, windfalls, grossly unfair results, this is a PMA that is unambiguous that undeniably sought to avoid the equitable considerations that would have been applied under the IMDMA, instead adopting a third decision, a contractual arrangement under a PMA that was not contingent upon either the IMDMA or the common law. It's a PMA that was drafted by Ron. At his insistence, he would not have married Catherine but for it. And it's one that greatly favored him in the totality of the agreement. He enjoyed huge protection of a separate property. And he controlled, had absolute control over whether any property would ultimately fall onto the contractually defined rubric of joint property. And that's a definition that has distinct meaning from joint tenancy and the common law, as I'll get to below. I do want to correct a few issues that were raised by the Court, however, though. Counsel, I believe, overstates Catherine's anticipated receipt under his interpretation. As the lower court held in its memorandum opinion at page 13, Catherine would receive little or absolutely nothing were Ron's contribution claim to be held. It's not a question of $1 million. The trial court made the factual finding that she would receive basically nothing. And that factual finding is entitled to deference at this stage. This premarital agreement bars the right of contribution against joint property for several reasons. It is evident from the plain and unambiguous meaning of the PMA. The lower court applied that plain meaning, including its understanding of the phrase all proceeds of joint property, to indicate that recruitment of prior expenses that might have been advanced by one of the parties was not recoverable under a PMA that focused solely upon title. Also, the PMA does not provide for other parties to be treated as mere lower case joint tenants at common law. It created a new set of rules and a contractually defined and aggregated a number of tenancies, joint tenancy, tenancy by the entirety, tenancy in common, into one contractually defined term, with all proceeds and all joint property to then be divided equally. That focused on title. And the terms of the PMA were distinct from the common law as well as the IMDMA. Now, Ronald's appeal hinges largely on the argument that by signing the PMA, the parties opted out of the IMDMA and simply elected to be treated as common law tenants. That is simply not the case here. It is belied by the plain meaning of the PMA. It also depends on an argument that the law in existence at the time the PMA was signed was joint tenancy law as would have existed between unmarried couples. And that's not the case here. When the IMDMA was passed in 1977, it displaced common law precepts of joint property as between married parties. I'd refer the Court to N. Ray Fleming for that doctrine. It's never addressed in it in the yellow papers that the appellant offers. But the meaning is that at the time the PMA was signed in 1993, and at the time that the married parties, Ronald and Catherine, acquired Carmel and Astor, they did so against the backdrop of the controlling law being the IMDMA. That displaced any contribution rights that might have existed as between the parties. Now, we're not arguing that the IMDMA and 503 contribution should apply. The parties chose a third rail. But the default is not then to the common law. If there are any gaps, it should be to the IMDMA. Now, in our view, the PMA is a complete and unambiguous expression of the parties' agreements that doesn't require gap-filling here. But to the extent that the argument holds true that the law in existence should be applied, the IMDMA displaced any common law doctrines. It might be a little different if Ronald and Catherine as unmarried parties had acquired joint property, signed a PMA, and then proceeded off. But they didn't. At the time they took title, they were man and wife in both Carmel and Astor. And Ronald, as the Court acknowledged, is an astute and sophisticated investor who had a significantly great disparity of wealth relative to Catherine, both at the time that the PMA was signed and at the time of dissolution. And akin to the court in Berger, Ronald had every control in his hands to ensure whether joint property was ever created. The parties engaged in a number of real estate transactions both prior to and during the marriage. And for the vast majority of those transactions, Ronald's name was sold, Ronald Hope title solely. Properties were sold, proceeds went to Ronald's bank accounts in a separate name, and they became his under the PMA at the time of dissolution. They chose to treat these two properties differently. The contract here is presumed to contain all material terms, and it does. Ronald would ask the court to unpermissibly fill gaps by invoking long-since displaced concepts of the common law. This contract has to be viewed as a complete expression of the party's agreement, and the interpretation of the contract should not render any provision superfluous or contradictory. Now, the first recital of the PMA, which is incorporated in the operative body of the document, is offered by both parties as evidence of their interpretation. But what it says is that the parties are foregoing all rights that have available to them in consideration for those ones which are expressly set forth in the PMA. And that evidence is a view to not invoke or gap fill from other law. It's solely to be limited upon the law that's set forth in the premarital agreement. And the plain and unambiguous meaning of 7B of the joint property section is that all joint property, including all proceeds, should be divided equally. Now, when the rights were acquired by virtue of marriage and foregone under the PMA, they forego rights such as Section 503 of the IMDMA, which had displaced the common law and which would have allowed Ron to have made claims for a contribution of his At the same time, 503 would have allowed Catherine to make claims about her non-equity contributions to the property, and the Court would have taken other equitable principles into play, such as the parties' disparate wealth, education, et cetera. The parties clearly wished to avoid that situation. They wanted to avoid a situation where equity would come into play. It would be determined solely by title. And that benefited Ron greatly. It didn't benefit him because he chose to check. In these limited instances, he chose to title these properties knowingly as joint property. And the result is clear under the PMA. Now, the appellant in his argument indicated that why do we capitalize terms? We do so because they have independent meaning. And I think that has significance with respect to the PMA here. Paragraph 7 of the PMA aggregates joint tenancy, tenancy by the entirety and tenancy in common, into a defined capitalized term of joint property. It's not a definition of convenience. It's one that has specific legal meaning and is intended to denote a specific means of distribution for joint property that is distinct from the common law. And that's evidenced by the fact that the way that the PMA treats joint property is different than those three means of holding title would at the common law. For example, tenancy in common, paragraph 7C requires that all proceeds be divided equally. That's in conflict with the way that tenancy in common would function at common law, where the parties could hold unequal ownership interests. Similarly, paragraph 8A of the PMA provides that upon death, the surviving joint tenant shall be entitled to all the joint property. Again, under tenancy in common at common law, those interests would pass to heirs upon death, not to the surviving joint tenant. So that denotes a treatment of the defined term joint property distinct from the common law. It's distinct from the IMDMA. They chose, as they're entitled to do under the Uniform Premarital Act, to execute a contract knowingly that provides for their rights. And all rights are set forth under the PMA. In O'Ronnell's interpretation, the court would have to go beyond the four corners of the document and silently revive common law displaced by the IMDMA. But as noted above, it's not even so much that the court would have to say we will recognize, we will revive prior displaced common law. You would have to silently modify it because of the different treatment that would have existed at the common law as to tenancy in common. And when you aggregate those terms as the capital joint tenancy or, excuse me, joint property, you clearly denote a means of treating this property differently than you would have otherwise. Now, joint property under the PMA is to be divided equally. The lower court held it had a plain and unambiguous meaning. And that's how we applied it. The proceeds and any gains, any property in exchange for property all becomes joint property. All has to be divided equally. It calls for the equal division of all proceeds of sale. And on its face, that would preclude the allocation of portions of one party's joint property to account for unequal contributions to acquire or maintain that property. Now, O'Ronnell argues that divided equally means only that the parties are to be treated equally with either party holding equal shares in joint tenancy. It's really no different than if Ronald and Catherine had set up a bank account in joint tenancy as joint account holders where Ronald contributed a million dollars. And ten years passed and there was still a million dollars in that account. Under Ronald's theory, in order for the parties to be treated equally, Ronald would get a million dollars and Catherine would get nothing. And applied to the real property, the same would result. And that is not equal treatment. Ronald is calling for equity when he plainly sought to avoid the equitable concepts of the IMDMA. He didn't wish to be treated under the IMDMA so that Catherine would have access to his separate property. The separate property definition includes all property acquired by Ron after the marriage, all income, so long as he holds it in a separate property. He had every ability and every access to determine whatever became joint property. Clearly, during the course of the marriage, they sought to maintain and they evidenced a means of recognizing how to deal with that during the course of the marriage. And during the course of the marriage, when Ronald saw that this was becoming a her interest and ask her, or decrease her interest from 50-50 to 99 percent and 1 percent. The reason being that he knew that Catherine would be entitled to equal proceeds of joint property upon dissolution of marriage. Now, I only offer that to the extent the Court wishes to go beyond the confines of the plain language as Ronald is offering. But we think it's unambiguous on its face. Title not equitable contribution was plainly dispositive. It was an attempt to avoid equity. And as noted, this case is very similar to Berger where a primarial agreement existed and the Court looked for reasons why the husband there had jointly titled assets. It wasn't issues of convenience. He was an astute investor just as Ronald was. And it's evidenced by the real estate deals executed by the parties. And if Catherine, if Ronald had wanted, he could have made Catherine be responsible for expenses relating to joint property. The PMA, for example, provides that Catherine was entitled to live in a primary residence for two years in the event of Ronald's death with the estate covering all expenses. And the trial court took that into account. The trial court noted that Ronald could have provided for a right of contribution, but he failed to do so. It's not within the four corners of the document, and it can't be considered now. It should be interpreted according to the plain meaning. Furthermore, the indemnification provision in paragraph 12 of the PMA would further undercut any claim for contribution. The indemnification provision bars claims on debts incurred without the consent of the other. The trial court made the factual determination that Ronald did not consult with Catherine on any expenses after March of 2006 for either the Carmel or the Astor property. Did the trial court consider Catherine's testimony, which may have conflicted with her 2016 admission? There's 44 of your briefs. The trial court allowed the testimony but didn't consider it and didn't view that it was in conflict. The request to admit that were at issue, claim to contradict, related to understandings between the parties during the course of the marriage. And the court determined that those were not waivers or modifications of the premarital agreement. And Catherine's testimony amounted to no more. It said, we had understandings during the course of the marriage as to how we would structure the affairs. You'll make a down payment on this. I'll do that. I will contribute the sweat equity. I'll do the labor on this. And the court determined that those were simply means of how married persons decide to organize their affairs on a day-to-day basis. And Catherine, her testimony had nothing to do as far as she was concerned with the PMA. And there was no inconsistency there then. Because the PMA was never modified, it becomes triggered upon dissolution. And whatever understanding the parties might have had as husband and wife do in the ordinary course of the marriage, the rules change once the PMA is triggered upon dissolution. The 216 admissions that counsel refers to, were those the result of failure to answer or actual affirmative answers? There was a bit of a delay, as I recall from the record, because the request to admit were filed in a chance reaction prior to their consolidation with the dissolution proceedings. And because the Rule 313.1 disclosure statements had not been filed under the Domestic Relations Rule, the time for discovery had not yet been triggered. The court allowed Catherine additional time to answer their request to admit. There was motion practice thereafter on the sufficiency of those admissions, whether objections were proper. And the court, by order, ultimately entered that certain admissions would be deemed admitted. Ultimately, the substance of those admissions did not contradict with the plain terms of the premarital agreement. And they amounted to really no more than within the confines of the marriage, the parties understood that they would have a certain course of dealing. But once the premarital agreement became triggered, it became the operative body, it became the controlling law. Are you? Two minutes. Now, the trial court, in its determination, made a finding that there can only be two categories of property under the premarital agreement, joint and separate property. And the court determined that Catherine's interest in the joint property, Catherine and Ron's respective joint property, can only be their separate property. Now, that is an argument that has basis within the premarital agreement. And I would ask the court to consider paragraph 4 of the premarital agreement in conjunction with Section 503A4 of the IMDMA. Paragraph 4 of the premarital agreement defines separate property to include all nonmarital property under Section 503A. Section 503A4 of the premarital agreement of the IMDMA includes as nonmarital property that property which is excluded from the marital estate by the valid agreement of the parties. The premarital agreement is a valid agreement of the parties which excludes property from the marital estate. Therefore, joint property or Catherine and Ron's interest in it can only be their respective separate property against which no claims of contribution can be made. And therefore, their respective interests have to be their own separate property. There can't be any marital property, there can't be any nonmarital property that doesn't ultimately fall within the bucket of separate property and joint property. But again, these were very sophisticated parties. There existed a significant disparity of wealth at the time of the marriage. It was only exacerbated at the time of dissolution. And it's an agreement that to the extent equitable claims are considered, which we think this agreement screams avoid equity, simply look at title. It's an agreement that favored Ron greatly. He enjoyed significant protection over all of his assets. And as the lower court made a factual finding, his interpretation would leave Catherine with little or nothing of the joint properties. That was not the intention of this agreement. It's not, it's, I think the plain language of the agreement would belie that that was the result, that they would lock the front door and separate property to Ron's great favor and then allow silently revived common law contribution claims to arise when there's nothing in the agreement that addresses them. The plain language of this agreement provides that joint property is to be divided equally. And there's really only one common meaning that would apply to that. Even, this agreement doesn't talk about net proceeds. It talks about all proceeds. And counsel mentioned that Catherine had co-signed on various notes. All of those mortgage debts on Asser and Carmel were taken into account before any money was divided. With respect to Carmel, the property had been sold. There was a payoff statement. The bank was made whole. That was, any real estate taxes were paid. And what remained were the proceeds. And those were divided equally. Asser was not sold because Ronald wanted to retain it. He occupied it for several years prior to entry of dissolution. And the court took into consideration when it made a factual finding as to the valuation of the Asser property. It made a determination of valuation. It identified the outstanding encumbrance from the banks. It deducted the net value. It deducted the value of that property against the mortgage. And what was left were the proceeds that were then divided equally. So any debts to any third party have been made whole. The only debts that Ron seeks to assess here are advances that he made during the course of the marriage that he contends were in excess. And to do that, he has to rely solely on common law principles of joint tenancy, which do not apply between the parties. The IMDMA was in effect when the parties were married. It displaced the common law. And the parties plainly chose a third course. They contracted for a different set of rules. And those rules are expressed completely within the primarial agreement. We'd ask the Court to affirm the lower court ruling. Thank you, Mr. Haffman. Thank you. Mr. Schwartz, very briefly. Thank you, Your Honor. Mr. Haffman just told you focus on title.  What's your contribution regarding joint tenancy? The reliance on the Berger case, I think, is an apposite here. The Berger PMA was different than the Chess PMA. The Berger PMA, as I recall, did not eliminate marital property, whereas the Chess PMA did. The problem that we see is they agree that the parties opted out of the PMA and then they decide that they're going to opt back in whenever it's convenient. They can't do that. The parties agreed not to apply the divorce statute. When they signed the PMA, it doesn't apply. They can't opt back in and say, well, it applies because it displaced the common law. You can't displace the common law if we're not applying the divorce statute. As to Catherine's consent to the expenditures, the co-signature on the consent to all the expenditures with respect to Astra and Carmel, there was also something that we called a standby order that was executed early on. This was Exhibit 560 at trial. In the record, it's 5626 through 5628, I believe. It was signed by both Catherine and by Ron. We have the page with Catherine's signature on it. I believe it was signed by Ron as well. And what that did was it authorized each party to be responsible for certain properties. It authorized Catherine to be responsible as a liquidating partner with respect to the Palmolive property, and it authorized Ron to be responsible as a liquidating partner with respect to the Astra and Carmel properties. This is an explicit consent authorizing Ron to take actions with respect to the properties. What about counsel's argument that if there's a fallback position, you don't go to the common law, you go back to the statute? You can't go back to the statute because the parties specifically said we're not going to apply the statute. They eliminated that by agreement. So the only thing you can fall back upon is the common law because that's the What if the PMA were declared to be void for some reason? Then what would you have? You'd have the statute, right? I think in all fairness, I think that is correct because if the entirety of the PMA were declared void, then you would have the instrumentality of eliminating the instrumentality that eliminated the divorce statute would be knocked out. I do believe the PMA had a severability clause in it, though. I can find it if you. No, that's right. But I think that's the answer to your question, Justice. One minute. The bottom line is I think this was a very result-oriented ruling, as Mr. Heffman just alluded to. The trial, the lower court did not want Catherine to wind up with nothing. And in essence, the lower court erred by giving equity to Catherine by saying we're going to interpret this in a way that's not going to leave her with nothing, but then said Ron was not entitled to equity. And equity is equality, equality of treatment. Equality is equity. There's an equitable maxim to that effect. This is a terribly unfair type of a ruling, and we ask you to reverse it. Thank you very much. Thank you. This case will be taken under advisement.